## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JANE WALTERS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  19-1010-EFM |
| | ) | |
| DOLLAR GENERAL CORPORATION, | ) | |
| DG RETAIL LLC, and | ) | |
| IIM, INC., dba Innovations in Management, | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS, AND FOR ORDER FOR SECOND MEDIATION

COMES NOW the Plaintiff, Jane Walters, and moves the Court for Attorney's Fees and Costs, and for an Order for a Second Mediation.

## I.  INTRODUCTION.

### A.  Factual Background.

Dollar General Corporation and DG Retail, LLC, own a "Dollar General" store in Pratt, Kansas.  Dollar General Corporation owns DG Retail, LLC.  At least as early as 2009 Dollar General Corporation recorded that there was a "trip hazard" on the sidewalk at the Pratt Dollar General store. Dollar General Corporation decided not to fix the sidewalk at that time, and instead chose only "to do VERY basic repairs".  (Ex. 4, DG 0019.)

In the years leading up to June, 2018, customers repeatedly complained about problems with the sidewalk.  Customers complained to Barry Jenkins, a store "key holder" who worked at the Pratt DG store from July 2017 to June 2018 four to five times a month about the condition of the sidewalk.  Each time a customer complained to Mr. Jenkins, Mr. Jenkins reported it to the General Manager or Assistant Manager.

Customers complained about the sidewalk to Kelcy Koster, who worked at the store during 2016 and 2017, and a second stint in 2017 and 2018, three to four times per month. Customers told Kelcy Koster that they had tripped on the sidewalk about once a month. Each time Kelcy Koster received a complaint about the sidewalk or a report of a customer tripping on the sidewalk she would explain that store employees were trying to get corporate to fix the sidewalk, but corporate wouldn't fix it. If the store manager was working on a day when Ms. Koster received a complaint or a report of a trip, Ms. Koster would report the complaint or the trip to the manager.

The sidewalk was essentially in the same dangerous condition from 2014 to 2018, according to another store employee, Annie Richey Arredondo. Customers complained about the condition of the sidewalk to Annie Richey Arredondo "a couple" times per month. Each time Annie Richey Arredondo received a customer complaint about the sidewalk Ms. Richey Arredondo relayed the complaint to the general manager. Ms. Richey Arredondo repeatedly reported the problems with the sidewalk to corporate, but got no response.

Dollar General Corporation's District Manager, Charles Michael Robb, had personal, first-hand knowledge of the condition of the sidewalk - the crack, the missing concrete, the separated concrete, the sloping concrete, the hole, the raised and separated slabs, etc., from his visits to the store in the years leading up to 2018. (Robb depo., Ex. 5, p. 24:16-25.)But Dollar General Corporation ignored the dangers.

On June 13, 2016, Debbie Lowe fell on the sidewalk because of the uneven cement, suffering a broken toe and a hip injury. (Ex. 4, DG 00002.) Ms. Lowe reported the incident to an employee on duty, then also reported the incident to the store manager, Janelle Verstraete. Ms. Lowe gave a recorded statement to Dollar General Corporation's risk management department and reported the problems with the sidewalk which caused her to fall. (Ex. 6, DEF 000001-10.) The next day, June

14, 2016, Janelle Verstraete, the General Manager at the subject store reported to corporate in a "ticket" that the:

> "sidewalk is very uneven and broken in areas that causes customers to trip over had a customer fall over it that caused them to get hurt." (Ex. 4, DG 0015.)

On April 12, 2017, another customer fell on the dangerous sidewalk.  On that Day Pearl Covey suffered an injury to her face and head when she tripped on the broken sidewalk.  Instead of fixing the sidewalk, Dollar General Corporation gave Ms. Covey a $500.00 settlement and asked Ms. Covey to sign a Confidentiality Agreement. (Ex. 4, DG 00007-8.)   Ms. Covey signed the Confidentiality Agreement and added a note:

> "Won't shop there no more.  This is a negligence upkeeping entrance to this store on outside upkeep".

On April 12, 2017, Ms. Verstraete again reported to corporate:

> "sidewalk is all buckled up and holes in sidewalk.  **very dangerous to customers.**  I had a customer today trip and hit her head." [Emphasis added.] (Ex. 4, DG 0017.)

Two days later, on April 14, 2017, the ticket priority was changed from "NORMAL" to 'CRITICAL".  But then three months later, on July 12, 2017, the ticket created by Ms. Verstraete was closed without any repairs having been made.  Dollar General Corporation concedes that this CRITICAL ticket was never sent to a vendor to make repairs.  (Heisse depo., E. 7, pp. 67:2-69:3.)

On April 14, 2017, Mike Vallone, a junior claims adjuster at Dollar General Corporation's national headquarters, emailed Anne Marie Heisse (Senior Manager for Facility Maintenance) with photos of the subject sidewalk, reporting:

> "We have a store that is having a large amount of accidents on a sidewalk in disrepair.  See pictures attached." (Ex. 4, DG 00009-13.)

On June 3, 2018, Jane Walters went to the Pratt Dollar General store to purchase some flower

pots.  Ms. Walters purchased the pots then turned to exit the store.  She consciously avoided the exit door which was broken, exited the building still thinking about the broken door, and turned toward her right to walk down the sidewalk toward her car.  Ms. Walters' view just in front of her feet was obstructed by the pots which she was carrying in both arms in front of her, and she was distracted by the merchandise displayed by Dollar General on the sidewalk in front of the store, and so she forgot about the broken and cracked sidewalk with missing pieces of concrete.  As Ms. Walters stepped one of her shoes got caught in a hole causing her to trip.  Because the edge of the sidewalk closest to the parking lot was broken and sloped downward, Ms. Walters was unable to catch herself and she fell.

After Ms. Walters fell key-holder Barry Jenkins came outside and saw her and what happened.  At his deposition Mr. Jenkins testified:

> Q.    Given that people had been telling you four or five times a month the whole time you worked there that there were problems with the sidewalk, and given your own observations of the sidewalk, when Ms. Walters told you that she'd tripped on the sidewalk, was it any surprise to you that that had happened?
>
> A.    No surprise whatsoever.
>
> Q.    Why was it no surprise whatsoever?
>
> A.    I guess I – somebody – I mean, it was no surprise 'cause where she fell, it was probably the worst part of the crack. (Jenkins depo., Ex. 8, p. 36:11-24.)

The day after Ms. Walters fell, June 4, 2018, the Dollar General Corporation District Manager for the area, Charles Robb, sent a ticket to corporate stating:

> "I have put in several tickets for this broken sidewalk yet they disappear.  We had yet another customer fall and bust their nose open. This is the 3rd time in 12 months we have had a customer fall.  Can we please get this fixed asap?  The buckle is so big it takes up over half the sidewalk.  Thank you" (Ex. 4, DG 0014.)

On June 6, 2018, Anne Richey, one of the employees at the subject store, reported to corporate:

> "the sidewalk that wraps around the building has been cracked very badly for years and customers continue to trip over side walk and we've had many bad accidents happen to these people over the years but this issue to fixing the sidewalk continues to be ignored. one day I feel like someone will sue." (Ex. 4, DG 0016.)

In a subsequent entry dated August 7, 2018, the District Manager recorded:

> "We have had  8 customers get hurt over the last 14 months.  We need this addressed.  We receive customer complaints DAILY.  Its not fair to the customer or the employees who have to explain to customer why its still not fixed ETA??" (Ex. 4, DG 0014.)

Dollar General Corporation chooses to display merchandise on the sidewalk in front of the store for the stated purpose of getting customers to look at the merchandise and buy it.  DG corporate tells the stores what merchandise to display on the sidewalk, which tends to be things like colorful lawn chairs, wading pools, bags of wood chips, etc.  Dollar General Corporation knows that customers may get distracted by the merchandise on display, by looking for their keys, by looking for their cars, and by other things, and may forget about the condition of the sidewalk.  (Arredondo depo., Ex. 9, p. 38:11-20.)  Depending on how merchandise is being carried, merchandise can obstruct customers' view of the problems on the sidewalk.

A year before Ms. Walters fell, the store manager, Ms. Verstrate, reported to corporate that the sidewalk was "very dangerous to customers".  Dollar General Corporation knew that customers could be injured or killed by sidewalks such as this, but that they did not fix the sidewalk in the years before Ms. Walters' fall and they did not place any warnings or do anything else to protect customers from being injured or killed.  (Verstrate depo., Ex. 10, pp. 31:24-33:8.)

Dollar General Corporation alleges fault against its maintenance vendors, but concedes that

it is Dollar General Corporation's decision as to whether to use a vendor or to use its own employees to do maintenance and repairs.  Dollar General Corporation further concedes that is their own decision as to how much supervision to provide over vendors that DG chooses to use.  If a vendor is not doing a good job Dollar General Corporation has the ability to have the vendor redo the job or to hire a different vendor to do it.  Ultimately it is Dollar General Corporation which makes the decision as to what is or is not being done.  (Heisse depo., Ex. 7, pp. 29:16-30:6.)

Dollar General Corporation does not have any system in place to supervise their vendors to make sure that the vendors do what was being requested.  Both at the local level and at the national corporate level Dollar General Corporation knew about the condition of the sidewalk at the Pratt, Kansas, store before June 3, 2018, and employees at the local level had put in multiple tickets to get the sidewalk fixed before that time.  (Heisse depo., Ex. 7, p. 30:8-16.)

Dollar General Corporations designated corporate representative conceded at her deposition that it was Dollar General Corporation's responsibility to fix the sidewalk before Ms. Walters fell, and that it was Dollar General Corporations responsibility to make any necessary repairs.  (Heisse depo., Ex. 7, pp. 129:2-3; 122:16-18.)  But instead of making the necessary repairs every day that the store was open people were put at an increased risk of falling and being injured or killed.

As a result of the negligent, willful, wanton and reckless conduct of Dollar General, Jane Walters fell and suffered injuries to her head and face  leaving her with dark marks under her eyes, a scar above one eye, and a nose which is deviated to the side causing breathing problems.  The physical injuries are just part of her damages.  She has suffered emotionally, socially, and mentally.

In her deposition Ms. Walters explained that following the fall her thought processes were affected.  She would go to work and then go home and lock herself in the house.  When she had to go to the grocery store she would forget what she wanted to purchase.  She didn't drive for an

extended period of time.  People who saw her would ask her about who beat her up.  She had to have a soft diet while her teeth healed.  If she spent time outdoors her head would ache and throb.  She completely neglected yard-work for a year and still cannot work in the yard as she did before the fall.

Ms. Walters continues to have nightmares about the fall.  The nightmares include visions of the other people who fell before her.  She feels that she is of no value - that she is not worth fixing the sidewalk even though Dollar General made $7.2 billion in profits the year before she fell.  This makes her anxious and gives her feelings of anger and anxiety and worthlessness.

The headaches continue.   As she says, "I'm not the person I was before I fell on that sidewalk."  "I'm not the same person that fell on that sidewalk.  I was healthy 100%, had no injuries, no problems, no breathing, no sinus problems, no anything before I fell on that sidewalk.  I was healthy."  But now she has sinus problems which wake her up at night.  The ENT has suggested surgical options including septoplasty and turbinate reduction but she fears surgery and is concerned about whether she will get better.  The area on either side of her nose and under both eyes is still hardened.

In 2017 Dollar General had gross profits of over $7.2 billion.  It would have cost $5,250.00 or less to replace the sidewalk before June, 2018.  Yet Dollar General spent nothing to fix the sidewalk, resulting in Ms. Walters being severely injured.

### B.      Procedural Background And Mediation.

On January 17, 2019, Plaintiff filed suit against Dollar General Corporation and DG Retail, LLC. seeking damages against each of the Dollar General defendants "in an amount in excess of $75,000.00 for [Plaintiff's] injuries and damages as described herein, for punitive damages sufficient to punish a company which makes a gross annual income of more than $7,200,000,000.00, plus costs, and for such other and further relief as the Court deems just and equitable."

A First Amended Complaint was filed on June 5, 2019, adding a claim against one of Dollar General Corporation's vendors which Dollar General claimed to be at fault.  In the First Amended Complaint Plaintiff made the same damage claim against the Dollar General defendants.

On April 12, 2019, a Scheduling Order [Doc. 14] was entered in this case.  The Scheduling Order required the parties to submit good-faith settlement proposals.  Plaintiff submitted a good-faith settlement proposal of $5.3 million.  This amount was the statutory cap for punitive damages and the pre-*Hilburn* statutory cap for non-economic damages.

On December 3, 2019, an Amended Scheduling Order [Doc. 54] was filed.  Both the original Scheduling Order and the Amended Scheduling Order required the parties to attend mediation.  Due to COVID-19 depositions had to be delayed, resulting in the mediation being delayed to July 16, 2018.

Prior to the mediation, Plaintiff's counsel contacted defense counsel to confirm that Plaintiff expected Dollar General Corporation and its insurer to comply with D. Kan. Rule 16.3( c )(2).  Here is the exchange:

> **Andrew and Justen:**
>
> **This email is to confirm that we expect Dollar General Corporation to comply with Rule 16.3(c )(2) with the corporate decision-maker with full authority present in person at the mediation on Thursday, and that we expect the same from CHUBB.  See *Long v. Am. Family Mut. Ins. Co.,* No. 19-4036-HLT-ADM, 2019 U.S. Dist. LEXIS 193885 (D. Kan. Nov. 7, 2019).**
>
> **Please let me know your client's and the insurance representative's departure flight information for Thursday so that we do not run into any time problems.**
>
> _____
>
> Matt,
>
> We will have our client's representative with settlement authority

present and if we begin on time at 9am we should have more than enough time to try to get it resolved.

———————

**Justen:**

**The confirmation we received from Dennis' office says 10am. I can be there by 9am if you want to change the time.**

**Also, someone who has settlement authority doesn't necessarily meet the requirements of a person who has decision making authority. Please confirm that the corporate representative from Dollar General Corporation and that the CHUBB representative both are the decision makers who don't need to call elsewhere to get authority.**

———————

Matt,

I'm glad that you pointed that out because I cannot find a copy of that correspondence and I have it my calendar to begin at 9am. I fine either way. If we can begin at 9am that will just give us more time to try to get it resolved.

We will have a "representative with settlement authority… who can settle the case…" present for mediation as is required by Local Rule 16.3(c)(2). We will not be calling elsewhere to get authority.  (See Ex. 1.)

Plaintiff's counsel spent hours preparing a detailed mediation submission and package of evidence for the mediator.  Plaintiff and her attorney traveled to Wichita for the scheduled mediation on July 16, 2020, ready to mediate in good faith and expecting Defendants and their insurance company to do the same.  Such did not happen.

No one from CHUBB appeared.  As reflected in Defendants' Initial Disclosures, CHUBB is Dollar General Corporations insurance carrier.

Dollar General Corporation sent a junior "claims adjuster" who is also a witness in the case, Michael Vallone.  According to Mr. Vallone's deposition testimony, Mr. Vallone is a "claims

9

adjuster" for Dollar General Corporation and is not even a "senior claims adjuster" since he has only

been in the position for four years.  (Vallone depo., Ex. 3, pp. 9:25-10:5; 27:17-18.)  Mr. Vallone

is one of the "newer" claims adjusters.  (Vallone depo., Ex. 3, p. 15:7-8.)  Mr. Vallone is the Dollar

General Corporation employee who negotiated the confidential settlement with Ms. Covey following

her fall on the sidewalk in 2017, and obtained photographs at that time showing the condition of the

sidewalk.  Mr. Vallone testified at his deposition that the condition of the sidewalk at the Pratt Dollar

General store was "not like atypical" of the sidewalks at all of Dollar General's stores.  (Vallone

depo., Ex. 3, pp. 35:22-36:7.)

The newer in-house junior claims adjuster, Mr. Vallone, was sent to the mediation with

limited[1] settlement authority and no authority to make any decisions beyond the authority which he

had been given.  After that, Mr. Vallone and the defense attorneys had to call Dollar General

Corporation in Tennessee and excluded the mediator from participating in the call.  Mr. Vallone was

not given any additional authority and the mediator was not allowed to speak with the decision-

maker at Dollar General Corporation headquarters, so the mediation ended at 11:08am - two hours

and 8 minutes after it started.


## II.     <u>ARGUMENT AND AUTHORITIES.</u>

D. Kan. R. 16.3( c )(2) governs who is required to attend mediation, as follows: "Attendance

by a party or its representative with settlement authority at the mediation is mandatory, unless the

court orders otherwise.  The purpose of this requirement is to have the party or representative who

---

[1]Plaintiff is aware of the amount of the settlement authority given to Mr. Vallone, but is not disclosing it in this Motion in order to protect the confidentiality of mediation.  Needless to say, but the authority Mr. Vallone had been given was a nonstarter.  If the Court so allows Plaintiff will be happy to disclose the minuscule authority given to Mr. Vallone.

can settle the case present at the mediation..."

As quoted in the *Long v. Am. Family, supra*, case cited to defense counsel:

> "Magistrate Judge O'Hara explained that 'attendance' under the local rule 'means to appear in person and participate directly, not to stand by or participate by phone'; that 'a person with settlement authority does not need to pick up the phone to call anyone else to find out whether he or she can go any higher or lower'; and that a person with settlement authority is 'the' decisionmaker 'who has authority to meet the other party's demand, even if he or she chooses not to do so.'" *Id.* at 6-7.)

The mediator in this case had similar requirements.  Dennis Gillen was the mediator selected by the parties.  In Mr. Gillen's mediation confirmation letter, Mr. Gillen stated:

> "Also, I must request that each party have physically present at the mediation their respective client and/or a representative who has full settlement authority."  (See Exhibit "2".)

The "newer" junior in-house claims adjuster at Dollar General Corporation who had no decision-making ability and who had to call Dollar General headquarters to get authority is the definition of a person who does not have the required "settlement authority".  Avoiding the problem created by not having someone with decision-making authority at mediation was the very reason that Plaintiff emailed defense counsel before mediation noting the requirements of D. Kan. R. 16.3( c )(2) and *Long.*

The settlement authority given to Mr. Vallone was not meaningful authority to settle a claim with physical and mental injuries such as experienced by Ms. Walters, and certainly was not meaningful authority to settle a punitive damages claim against a company making $7.2 billion in profits a year.

As stated by the court in *Inter-Ocean Seafood Trader, Inc. v. RF Int'l, Ltd.*, 2013 U.S. Dist. LEXIS 15312, 2013 WL 441065 (D. Kan. 2013), a representative sent to a mediation does not have "full, meaningful authority" if the representative has to communicate with other "moving parts".  If

the attorney or representative sent to he mediation has to communicate with others at the company or with an insurer before accepting an offer, that person's authority is not "meaningful".  Id. at 5. The court reasoned that the purpose of mediation is to engage both the parties and the attorneys, and that not sending the decision-maker to the mediation "frustrates th[is] purpose by insulating the party from the mediator's counsel and advice." *Id.*

Here, CHUBB did not show up for the mediation and the Dollar General "newer" junior in-house claims adjuster had no decision-making authority.  Rather, Mr. Vallone and the defense attorneys had to call corporate in Tennessee to get a decision on settlement.  By not sending the Dollar General Corporation decision-maker, Dollar General frustrated the very purpose of mediation by insulating the decision-maker from the mediator's counsel and advice.  By not sending anyone from CHUBB, Dollar General likewise insulated the CHUBB decision-maker from the mediator. Since the decision-makers at Dollar General and CHUBB were not present, the mediation was a waste of time and was over in just two hours and eight minutes.

As a result of Dollar General's conduct, Plaintiff's counsel wasted 11 hours in preparing Plaintiff's mediation submission and an additional 4.75 hours for the mediation (including travel time and time meeting with the client before the mediation.)

III.   **CONCLUSION.**

Based on the facts arguments and authorities set forth herein, Plaintiff respectfully moves the Court for an Order awarding attorney's fees and costs, and for an order requiring a second mediation with the decision-makers from Dollar General and CHUBB present in person.

Respectfully submitted,

/s/ Matthew L. Bretz

Matthew L. Bretz, SC # 15466
**BRETZ & YOUNG, L.L.C.**
3 Compound Drive
P.O. Box 1782
Hutchinson, KS 67504-1782
(620) 662-3435
Fax (620) 662-3445
Matt@byinjurylaw.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 27, 2020, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:
Justen P. Phelps
Andrew G. Marion
GIBSON WATSON MARINO, LLC
301 N. Main, Suite 1300
Wichita, KS 67202
andrew@gwmks.com
justen@gwmks.com
Attorneys for Defendants

/s/Matthew L. Bretz
Matthew L. Bretz, SC # 15466
**BRETZ & YOUNG, L.L.C.**
3 Compound Drive
P.O. Box 1782
Hutchinson, KS 67504-1782
(620) 662-3435
Fax (620) 662-3445
Matt@byinjurylaw.com
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANE WALTERS,                )
          Plaintiff,           )
                                  )
vs.                                )       Case No.  19-1010-EFM
                                  )
DOLLAR GENERAL CORPORATION,    )
DG RETAIL LLC, and                )
IIM, INC., dba Innovations in Management,    )
          Defendants.       )
_____ )

**<u>AFFIDAVIT</u>**

STATE OF KANSAS, COUNTY OF RENO, SS:

I, Matthew L. Bretz, being of lawful age and being duly sworn upon oath, state as follows:

1.     I have personal, first-hand knowledge of the facts set forth in this Affidavit.

2.     I am an attorney at law duly licensed as such before all of the courts of the State of Kansas, the State of California, the United States District Courts in Kansas, Colorado, Nebraska, the Central District of California, the Western District of Oklahoma, the Western District of Missouri, the Northern District of Illinois, and the Tenth Circuit Court of Appeals.

3.     I have earned an "AV" rating from Martindale-Hubbell® and have carried this distinction for more than a decade.  I am one of the few personal injury attorneys in Kansas to have earned the "AV" rating.

4.     Other than *pro bono* work, I practice exclusively in the field of personal injury and related litigation including medical malpractice, automobile wreck, premises liability, products liability, and other types of injury claims.

5.     I am the attorney representing Jane Walters in this matter.

6.     I spent 11 hours preparing the materials for mediation, as follows:

14

| | | |
|---|---|---|
| * | July 10 | 2 hours |
| * | July 11 | 4 hours |
| * | July 12 | 4 hours |
| * | July 13 | 1 hour |

7.     This included preparation of an eleven-page submission letter to the mediator, citations for evidentiary support in depositions and documents obtained during discovery to every factual statement set forth in the submission, legal research concerning P.I.K. instructions and standards for punitive damages, and preparation of an exhibit notebook for the mediator.

8.     Additionally I spent 4.75 hours appearing for the mediation.  This includes drive time to and from Hutchinson, 30 minutes meeting with Ms. Walters before the mediation, and the time spent at the mediator's office.

FURTHER AFFIANT SAYETH NOT.

Date: 7/27/2020                                    Matthew L. Bretz

Notary:

NOTARY PUBLIC - State of Kansas
LAUREN RAIGOZA
My Appt. Exp. 7-17-22

15