**Matt Bretz**

| | |
|---|---|
| **From:** | Justen Phelps <justen@gwmks.com> |
| **Sent:** | Wednesday, July 15, 2020 12:11 PM |
| **To:** | Lauren Raigoza; Matt Bretz; Andrew Marino |
| **Cc:** | dennis@depewgillen.com |
| **Subject:** | RE: Walters v. Dollar General Corporation, et al. |

Great, thank you.

**Justen Phelps** | Attorney
**Gibson Watson Marino LLC**
301 N. Main, Ste. 1300 | Wichita, KS  67202
**p.** 316-264-7321 | **f.** 316-264-8614 | **e.** justen@gwmks.com
**Website:** www.gibsonwatsonlaw.com

This e-mail and any files transmitted with it are confidential attorney-client communication or may otherwise be privileged or confidential. They are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy, or retransmit this communication. Destroy it immediately. Any unauthorized dissemination, distribution, or copying of this communication is strictly prohibited.

**From:** Lauren Raigoza <Laurenr@byinjurylaw.com>
**Sent:** Wednesday, July 15, 2020 9:08 AM
**To:** Justen Phelps <justen@gwmks.com>; Matt Bretz <matt@byinjurylaw.com>; Andrew Marino <andrew@gwmks.com>
**Cc:** dennis@depewgillen.com
**Subject:** RE: Walters v. Dollar General Corporation, et al.

I just spoke with Mr. Gillen's office and he agreed to start at 9:00 a.m., tomorrow. Thank you.

Lauren

**From:** Justen Phelps <justen@gwmks.com>
**Sent:** Monday, July 13, 2020 3:52 PM
**To:** Matt Bretz <matt@byinjurylaw.com>; Andrew Marino <andrew@gwmks.com>
**Cc:** Lauren Raigoza <Laurenr@byinjurylaw.com>; dennis@depewgillen.com
**Subject:** RE: Walters v. Dollar General Corporation, et al.

Matt,

I'm glad that you pointed that out because I cannot find a copy of that correspondence and I have it my calendar to begin at 9am. I fine either way. If we can begin at 9am that will just give us more time to try to get it resolved.

We will have a "representative with settlement authority... who can settle the case..." present for mediation as is required by Local Rule 16.3(c)(2). We will not be calling elsewhere to get authority.

**Justen Phelps** | Attorney
**Gibson Watson Marino LLC**
301 N. Main, Ste. 1300 | Wichita, KS  67202
**p.** 316-264-7321 | **f.** 316-264-8614 | **e.** justen@gwmks.com



1

**Website:** www.gibsonwatsonlaw.com

This e-mail and any files transmitted with it are confidential attorney-client communication or may otherwise be privileged or confidential. They are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy, or retransmit this communication. Destroy it immediately. Any unauthorized dissemination, distribution, or copying of this communication is strictly prohibited.

**From:** Matt Bretz <matt@byinjurylaw.com>
**Sent:** Monday, July 13, 2020 3:31 PM
**To:** Justen Phelps <justen@gwmks.com>; Andrew Marino <andrew@gwmks.com>
**Cc:** Lauren Raigoza <Laurenr@byinjurylaw.com>; dennis@depewgillen.com
**Subject:** RE: Walters v. Dollar General Corporation, et al.

Justen:

The confirmation we received from Dennis' office says 10am.  I can be there by 9am if you want to change the time.

Also, someone who has settlement authority doesn't necessarily meet the requirements of a person who has decision making authority.  Please confirm that the corporate representative from Dollar General Corporation and that the CHUBB representative both are the decision makers who don't need to call elsewhere to get authority.

Matt

**From:** Justen Phelps <justen@gwmks.com>
**Sent:** Monday, July 13, 2020 3:09 PM
**To:** Matt Bretz <matt@byinjurylaw.com>; Andrew Marino <andrew@gwmks.com>
**Cc:** Lauren Raigoza <Laurenr@byinjurylaw.com>; dennis@depewgillen.com
**Subject:** RE: Walters v. Dollar General Corporation, et al.

Matt,

We will have our client's representative with settlement authority present and if we begin on time at 9am we should have more than enough time to try to get it resolved.

**Justen Phelps** | Attorney
**Gibson Watson Marino LLC**
301 N. Main, Ste. 1300 | Wichita, KS  67202
**p.** 316-264-7321 | **f.** 316-264-8614 | **e.** justen@gwmks.com
**Website:** www.gibsonwatsonlaw.com

This e-mail and any files transmitted with it are confidential attorney-client communication or may otherwise be privileged or confidential. They are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy, or retransmit this communication. Destroy it immediately. Any unauthorized dissemination, distribution, or copying of this communication is strictly prohibited.

**From:** Matt Bretz <matt@byinjurylaw.com>
**Sent:** Monday, July 13, 2020 12:17 PM
**To:** Andrew Marino <andrew@gwmks.com>; Justen Phelps <justen@gwmks.com>
**Cc:** Matt Bretz <matt@byinjurylaw.com>; Lauren Raigoza <Laurenr@byinjurylaw.com>; dennis@depewgillen.com
**Subject:** Walters v. Dollar General Corporation, et al.

Andrew and Justen:

This email is to confirm that we expect Dollar General Corporation to comply with Rule 16.3(c )(2) with the corporate decision-maker with full authority present in person at the mediation on Thursday, and that we expect the same from CHUBB.   See *Long v. Am. Family Mut. Ins. Co.,* No. 19-4036-HLT-ADM, 2019 U.S. Dist. LEXIS 193885 (D. Kan. Nov. 7, 2019).

Please let me know your client's and the insurance representative's departure flight information for Thursday so that we do not run into any time problems.

**Matthew L. Bretz**
**Bretz & Young, L.L.C.**
3 Compound Drive
P.O Box 1782
Hutchinson, KS 67504-1782
Phone:  620-662-3435
Fax:  620-662-3445
matt@byinjurylaw.com
www.byinjurylaw.com



CONFIDENTIALITY NOTICE: This e-mail and the transmitted documents contain private, privileged, and confidential information belonging to the sender. The information therein is solely for the use of the addressee. If your receipt of this transmission has occurred as the result of an error, please immediately notify us so we can arrange for the return of the documents. In such circumstances, you are advised that you may not disclose, copy, distribute or take any other action in reliance on the information transmitted.

Clients should be aware that: (1) e-mail communication is not a secure method of communication; (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from us to you or vice versa; (3) persons not participating in our communication may intercept our communications by improperly accessing our computer or our computers or even some computer unconnected to either of us which the email passes through. We are communicating with you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let us know at once.

Dennis L. Gillen
Jack Scott McInteer
Randall K. Rathbun
Charles C. Steincamp
Kimberly A. Vining
Kurt A. Harper

Benjamin K. Carmichael
William E. Dakan, Of Counsel

# DEPEW & GILLEN RATHBUN & McINTEER, LC

Spencer L. Depew (1933-2005)
Nicholas S. Daily (1949-2006)

May 12, 2020

Dennis@depewgillen.com

Mr. Matthew Bretz
Bretz & Young LLC
3 Compound Drive
P. O. Box 1782
Hutchinson, KS 67504

Mr. G. Andrew Marino
Mr. Justen P. Phelps
Gibson Watson Marino LLC
301 N. Main, Suite 1300
Wichita, KS 67202

Re:   *Jane Walters v. Dollar General Corporation and DG Retail LLC*

Counsel:

This letter will confirm that mediation of the above-referenced matter has been **rescheduled** to commence on **Thursday, July 16, 2020, at 10:00 a.m.** at the law offices of Depew Gillen Rathbun & McInteer, LC, 8301 E. 21st Street North, Ste. 450, Wichita, Kansas 67206-2936. My office has confirmed that our office has no conflicts of interest in this case. I will advise you, however, that I have been a mediator since 1983 and as such I may have previously mediated other matters which may involve (a) counsel in this matter, (b) potentially the insurers involved in this claim, or (c) related parties.

If there are any additional parties who need to be advised of this mediation, please let me know immediately.

I would request that all parties submit their case summaries regarding the issues that will be addressed during the mediation to me on or before **Thursday, July 2, 2020.** If I have questions concerning a submission, I may call that party for clarification. Also, I must request that each party have physically present at the mediation their respective client and/or a representative who has full settlement authority.

Please also recall the ground rules of the mediation. The mediation process and negotiations are not discoverable nor may they be used in any fashion or for any purpose at any trial or hearing unless otherwise ordered by the Court. Please understand that mediations and the discussions contained therein are to remain confidential as to all parties. (See D. Kan. Rule 16.3(i).) Please advise your clients that I am serving as an independent mediator and not as counsel for any party. Finally, please remember that if you do not want me to share (with opposing parties)



316.262.4000 ~ fax 316.265.3819 ~ depewgillen.com ~ 8301 E. 21st Street North ~ Suite 450 ~ Wichita, Kansas 67



PLAINTIFF'S
EXHIBIT
2

Counsel
Page 2
May 12, 2020

any information conveyed to me during the mediation, you should advise me of the same contemporaneously during the process.

     Please share this letter and its admonitions with your respective client(s).  I look forward to working with each of you – hopefully resulting in an amicable resolution of this matter.  If you have any questions, please do not hesitate to write or call.

                         Sincerely,

                         Dennis L. Gillen, of
                         DEPEW GILLEN RATHBUN & McINTEER, LC

sh

| | | |
|---|---|---|
| 1 | there, here in Nashville. | 00:05:30 |
| 2 | Q.      Sounds like a great job. | 00:05:31 |
| 3 | A.      It's a great part-time job, but it's not a | 00:05:32 |
| 4 | career. | 00:05:35 |
| 5 | Q.      And what's your position with Dollar General | 00:05:36 |
| 6 | Corporation? | 00:05:39 |
| 7 | A.      I am an insurance claims adjustor. | 00:05:39 |
| 8 | Q.      How long have you had that position as an | 00:05:43 |
| 9 | insurance claims adjustor for Dollar General | 00:05:54 |
| 10 | Corporation? | 00:05:56 |
| 11 | A.      I believe it's been about four years now. | 00:05:56 |
| 12 | Q.      What do you do as a claims adjustor? | 00:05:59 |
| 13 | A.      I get assigned assignments for incidents that | 00:06:02 |
| 14 | have occurred at the store and try to handle them and | 00:06:09 |
| 15 | get the matter settled. | 00:06:13 |
| 16 | Q.      And you said insurance claims adjustor.  Do | 00:06:15 |
| 17 | you actual -- you don't actually work for an | 00:06:19 |
| 18 | insurance company, though? | 00:06:21 |
| 19 | A.      No, we're self-insured.  Yeah, I do not work | 00:06:22 |
| 20 | for an insurance company. | 00:06:26 |
| 21 | Q.      Would it be fair to say you're a claims | 00:06:27 |
| 22 | adjustor for Dollar General Corporation? | 00:06:29 |
| 23 | A.      Yes. | 00:06:31 |
| 24 | Q.      What is your formal title? | 00:06:32 |
| 25 | A.      I believe it is claims adjustor. | 00:06:38 |

PLAINTIFF'S
EXHIBIT
3

| | | |
|---|---|---|
| 1 | Q.     And is there a certain hierarchy within the | 00:06:43 |
| 2 | claims -- | 00:06:50 |
| 3 | A.     They do have a senior position available.  I | 00:06:51 |
| 4 | do not have that designation since I have been only | 00:06:55 |
| 5 | doing that for four years. | 00:06:57 |
| 6 | MR. PHELPS:  Be a little more patient so | 00:06:59 |
| 7 | he can finish. | 00:07:01 |
| 8 | BY MR. BRETZ: | 00:07:03 |
| 9 | Q.     I'm kind of slow sometimes, so you may | 00:07:03 |
| 10 | anticipate what I'm going to ask. | 00:07:05 |
| 11 | A.     Okay. | 00:07:07 |
| 12 | MR. PHELPS:  Just when you think he's | 00:07:08 |
| 13 | done, he's got two more words coming. | 00:07:10 |
| 14 | THE WITNESS:  Okay. | 00:07:14 |
| 15 | BY MR. BRETZ: | 00:07:16 |
| 16 | Q.     Where did you grow up? | 00:07:17 |
| 17 | A.     Here in Nashville. | 00:07:18 |
| 18 | Q.     How far did you go in school? | 00:07:20 |
| 19 | A.     I have a bachelors degree and an associates | 00:07:22 |
| 20 | degree. | 00:07:26 |
| 21 | Q.     Where is the bachelors from? | 00:07:26 |
| 22 | A.     The -- both of them are from Southern | 00:07:28 |
| 23 | Illinois University in Carbondale.  They have two | 00:07:30 |
| 24 | different ones.  There's an Edwardsville University | 00:07:36 |
| 25 | and there's a Carbondale. | 00:07:38 |

1    A.      Yes, and those are -- a lot of those are          00:14:19

2    inside the store.                                         00:14:22

3    Q.      And would they all have around a hundred          00:14:23

4    claims a piece?                                           00:14:26

5    A.      I'm not sure, I don't -- they might have          00:14:27

6    more.  They have been doing it longer than I have.        00:14:31

7    Q.      You are one of the newer ones?                    00:14:33

8    A.      Yes.                                              00:14:36

9    Q.      And the trip and fall claims that you have        00:14:36

10   involve sidewalks, parking lots, things that occur        00:14:48

11   outside the store?                                        00:14:58

12   A.      Mainly, yes.                                      00:15:00

13   Q.      Is there a certain geographic area that you       00:15:01

14   handle?                                                   00:15:05

15   A.      No, I handle all over the country, almost         00:15:06

16   17,000 locations.                                         00:15:10

17   Q.      You said that one of your responsibilities        00:15:12

18   was to assess claims, the next one you said was to        00:15:24

19   determine whether anyone else was affected.  What is      00:15:28

20   that; what do you do in that respect?                     00:15:31

21   A.      If the store tells me they have had similar       00:15:33

22   instances, I will try to see what else we have had        00:15:40

23   and see if it was similar to, you know, a specific --     00:15:43

24   other incident in that area.  Sometimes descriptions      00:15:47

25   are broad, tripped over the sidewalk, not sure what       00:15:51

| | | |
|---|---|---|
| 1 | Q.      Broken shoulder? | 00:30:05 |
| 2 | A.      Yes. | 00:30:06 |
| 3 | Q.      Handled injuries involving broken shoulders | 00:30:09 |
| 4 | that ended up having to be replaced? | 00:30:11 |
| 5 | A.      No, but surgery. | 00:30:13 |
| 6 | Q.      Given that you are one of the newer people in | 00:30:16 |
| 7 | this job, are the more severe injuries given to other | 00:30:23 |
| 8 | adjusters? | 00:30:27 |
| 9 | A.      I don't -- I don't think so.  Because you | 00:30:30 |
| 10 | don't know sometimes when they're assigned. | 00:30:33 |
| 11 | Q.      Sure. | 00:30:37 |
| 12 | A.      Lots of times stores leave it vague, just | 00:30:38 |
| 13 | customer tripped and fell in the parking lot, and | 00:30:41 |
| 14 | then I call and, you know, three days later they | 00:30:43 |
| 15 | required surgery.  So I wouldn't say that my claims | 00:30:47 |
| 16 | are screened like all the time, but I am a junior -- | 00:30:50 |
| 17 | not a junior, I'm just a regular claims adjustor, I | 00:30:54 |
| 18 | don't have a senior designation. | 00:30:58 |
| 19 | Q.      How does an injury get from a regular claims | 00:31:00 |
| 20 | adjustor to a senior claims adjustor? | 00:31:05 |
| 21 | A.      I don't know, but I don't think there's any | 00:31:07 |
| 22 | designation like that going on with it.  I'm not | 00:31:09 |
| 23 | sure, I have never asked how they're divvied out. | 00:31:13 |
| 24 | Q.      Your office is at the corporate headquarters? | 00:31:28 |
| 25 | A.      Yes. | 00:31:31 |

| | | |
|---|---|---|
| 1 | A.      I believe the -- I'm not sure exactly who | 00:40:27 |
| 2 | took them.  Was it the store manage -- or the | 00:40:34 |
| 3 | district manager. | 00:40:38 |
| 4 | Q.      Perhaps Mike Robb? | 00:40:39 |
| 5 | A.      Yes. | 00:40:40 |
| 6 | Q.      Okay.  The photos DG-10 through 13, do those | 00:40:43 |
| 7 | appear to be fairly typical for a sidewalk at Dollar | 00:40:53 |
| 8 | General? | 00:40:59 |
| 9 |         MR. PHELPS:  Object to form. | 00:40:59 |
| 10 |         THE WITNESS:  I mean, like I said, we | 00:41:00 |
| 11 | have lots of different contracts.  Landlords -- some | 00:41:02 |
| 12 | of them are responsible for fixing the sidewalks.  So | 00:41:04 |
| 13 | that's -- I mean, by Dollar General owned properties | 00:41:08 |
| 14 | that we're responsible for, is this typical?  Or -- | 00:41:12 |
| 15 | because I can't -- I don't want to make an assumption | 00:41:16 |
| 16 | on landlord's responsibility property. | 00:41:18 |
| 17 | BY MR. BRETZ: | 00:41:21 |
| 18 | Q.      I'm not asking about who you think is | 00:41:21 |
| 19 | responsible for maintenance, I am just asking about | 00:41:25 |
| 20 | Dollar General stores. | 00:41:28 |
| 21 | A.      Yeah. | 00:41:29 |
| 22 | Q.      These photos, do they appear to be typical | 00:41:31 |
| 23 | for sidewalks at Dollar General stores? | 00:41:33 |
| 24 |         MR. PHELPS:  Same objection.  I think | 00:41:34 |
| 25 | what he's asking for clarification whether you are | 00:41:36 |

| | | |
|---|---|---|
| 1 | referring to all Dollar General stores, whether | 00:41:38 |
| 2 | they're leased or owned by Dollar General, or just | 00:41:40 |
| 3 | Dollar General home stores. | 00:41:42 |
| 4 | MR. BRETZ:  All of them. | 00:41:44 |
| 5 | MR. PHELPS:  Okay.  Same objection. | 00:41:45 |
| 6 | THE WITNESS:  I mean, I'd say that this | 00:41:47 |
| 7 | isn't typical, but it's not like atypical. | 00:41:50 |
| 8 | BY MR. BRETZ: | 00:41:54 |
| 9 | Q.    It's not the worst you've seen? | 00:41:55 |
| 10 | MR. PHELPS:  Object to form. | 00:41:57 |
| 11 | THE WITNESS:  Yeah, I don't know what you | 00:42:00 |
| 12 | mean by like the worst.  Like more busted up in | 00:42:02 |
| 13 | areas?  I mean, this one's up there, but it's not | 00:42:06 |
| 14 | probably the worst. | 00:42:09 |
| 15 | BY MR. BRETZ: | 00:42:11 |
| 16 | Q.    And you know that a sidewalk that's cracked | 00:42:17 |
| 17 | and broken and separated and raised with missing | 00:42:21 |
| 18 | concrete, you know that's dangerous for customers | 00:42:24 |
| 19 | because they might trip and fall and get a broken | 00:42:27 |
| 20 | bone or have a head injury, right? | 00:42:31 |
| 21 | MR. PHELPS:  Object to form and calling | 00:42:33 |
| 22 | for an opinion, but you can answer, if you know. | 00:42:36 |
| 23 | THE WITNESS:  I'd say it slightly | 00:42:38 |
| 24 | increases the risk. | 00:42:39 |
| 25 | | |

*CONFIDENTIAL*

**DOLLAR GENERAL**

# CUSTOMER INCIDENT REPORT

Scan & Send incident forms via STOREnet to Risk Management immediately

Today's Date: 6-3-18     Store#/Address: 07171

Customer Name: Jane Walters     Social Security #: 510 02 7887

Home Address: 1714 E. 6th

City: Pratt     State: KS     Zip: 67124

Date Of Birth: 08.02.1957     Phone #: 620-672-5490

Store Manager Name: Jamie Verstrate     Store Mgr Work Phone: 620 672 3090

District Manager Name: Mike Robb     District Mgr Work Phone:

Date of Incident: ~~4TT~~ 6-3-18     Time of Incident: 16:11 ☐AM ☑PM     Day of Week: Sunday

Date/Time Reported: ☐AM ☐PM     Name of Manager Reported To:

# STORE COPY

Scan & Send incident forms via STOREnet to Risk Management immediately

Describe the Incident in Detail:
walking on side walk and tripped and fell on face.

What Part of the Body was Injured? (Example: left arm, right index finger…)
face, scrapes on knee, nose looks broken.

Nature of Injury (Example: contusion, laceration, strain, etc.)
nose broken multiple scratches blood everywere

Name of Any Witnesses: (Include contact information.)

Cause of Incident: (struck by, repetitive, slip, etc)
side walk cracked

Was merchandise involved? ☐Yes ☑No     If so, preserve the merchandise and await direction from Risk Management

Did Customer Seek Medical Treatment? If so, where? pratt medical

Called In By: barry Jenkins   Title: key holder   Date: 06.03.18

Report Prepared By: amie Richey   Title: asm   Date: 06.03.18

Signature:

Risk Management Phone Number: 1-800-456-9446.     Scan & Send incident forms to Risk Management immediately.

DG-RM-6018-20090317P

DG 0001



PLAINTIFF'S
EXHIBIT
4

*CONFIDENTIAL*

**DOLLAR GENERAL**

# CUSTOMER INCIDENT REPORT

Scan & Send incident forms via STOREnet to Risk Management immediately

Today's Date: 6-13-16   Store#/Address: 1310 E. 1st, Pratt, KS 67124 #07171
Customer Name: Debbie L Lowe   Social Security #: 515720792
Home Address: 910 Brendon Ct
City: Pratt   State: KS   Zip: 67124
Date Of Birth: 7-13-64   Phone #: 620-388-7655
Store Manager Name: Janelle Verstraete   Store Mgr Work Phone: 620-672-3090
District Manager Name: Mike Robbe   District Mgr Work Phone: 405-205-5316

Date of Incident: 6-12-16   Time of Incident: 4:20   ☐AM ☒PM   Day of Week: Sun
Date/Time Reported: 6-13-16 8:05   ☒AM ☐PM   Name of Manager Reported To: Janelle Verstraete

## STORE COPY

Scan & Send incident forms via STOREnet to Risk Management immediately

Describe the Incident in Detail:
Arrived at dollar store, walked up on side walk, right shoe caught on uneve cement, fell over on rt knee, both hands

What Part of the Body was Injured? (Example: left arm, right index finger…)
right little toe, left hip

Nature of Injury (Example: contusion, laceration, strain, etc.)
sprain/broke little toe, left hip-maybe strained when fell

Name of Any Witnesses: (Include contact information.)
daughter Tiffany Henson 620 213 3134

Cause of Incident: (struck by, repetitive, slip, etc.)
Uneven cement on Sidewalk

Was merchandise involved?   ☐Yes ☒No   If so, preserve the merchandise and await direction from Risk Management
Did Customer Seek Medical Treatment? If so, where? NO

Called In By: _____ Title: _____ Date: _____
Report Prepared By: Janelle Verstraete Title: Manager Date: 10/13/16
Signature: Debbie L. Lowe

Risk Management Phone Number: 1-800-456-9446.   Scan & Send incident forms to Risk Management immediately.

DG-RM-6018-20090317P

**DG 0002**

*CONFIDENTIAL*

**DOLLAR GENERAL**

# CUSTOMER INCIDENT REPORT

Scan & Send incident forms via STOREnet to Risk Management immediately

Today's Date: 4/12/17          Store#/Address: 0310 E. 1st Pratt

Customer Name: Pearl Curry          Social Security #: 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

Home Address: 90660 10th st

City: Pratt KS          State: KS     Zip: 67124

Date Of Birth: 11/22/45          Phone # 620 508-6007

Store Manager Name: _____          Store Mgr Work Phone: _____

District Manager Name: _____          District Mgr Work Phone: _____

Date of Incident: 4/12/17     Time of Incident 11 40 pm ☐AM ☑PM     Day of Week: Wed

Date/Time Reported: 4/12/17 ☐AM ☑PM     Name of Manager Reported To: _____
11:40 pm

# STORE COPY

Scan & Send incident forms via STOREnet to Risk Management immediately

Describe the Incident in Detail:
Fell on Front Sidewalk hit head

What Part of the Body was Injured? (Example: left arm, right index finger…)
Face

Nature of Injury (Example: contusion, laceration, strain, etc.)
Cut on Nose / hit head.

Name of Any Witnesses:  (Include contact information.)

Cause of Incident: (struck by, repetitive, slip, etc.)
Sidewalk is Broken

Was merchandise involved? ☐Yes ☑No     If so, preserve the merchandise and await direction from Risk Management

Did Customer Seek Medical Treatment? If so, where? Pratt hospital

Called In By: _____          Title: _____          Date: _____

Report Prepared By: Janelle Verstraete   Title: Manager          Date: 4/12/17

Signature: Janelle Verstraete

Risk Management Phone Number: 1-800-456-9446.          Scan & Send incident forms to Risk Management immediately.

DG 0005

# *CONFIDENTIAL*

### RELEASE AND CONFIDENTIALITY AGREEMENT

#### Claim#: 201703217

THAT FOR AND IN CONSIDERATION of the sum of _____ five-hundred dollars _____ ($ 500 ), the receipt and sufficiency of which is hereby acknowledged and confessed, _____ Pearl Covey _____ (hereinafter the "RELEASING PARTY") does hereby compromise, settle, and fully release and forever discharge DOLLAR GENERAL CORPORATION, DOLGENCORP, LLC, DOLLAR GENERAL STORES, all other DOLLAR GENERAL-related companies or entities, successors, subsidiaries, agents, servants, insurers, contractors or employees (hereinafter, the "RELEASED PARTIES"), from any and all claims, demands, actions, or causes of action which the RELEASING PARTY have or may now or may in the future own or hold for damages or losses of any kind or character whatsoever, including, but not limited to any and all claims arising from any incident which occurred at a Dollar General store on or about _____ 4/12/2017 _____. This release, includes, but is not limited to, claims and/or causes of action for past and future legal and medical expenses, past and future physical pain, suffering and mental anguish, scarring, past and future loss of wages, earnings or earning capacity, property damage, attorneys' fees, any subrogation interest, past and future household services, punitive damages, damages for any violation of any state or federal statute or statutes, damages for any violation of any common law provision, and any other loss or damage of any kind or character whatsoever.

It is expressly understood and agreed that all bills for medical aid, hospital services, doctor services, chiropractic services, nursing, drugs and medicines have been paid or shall be paid by the RELEASING PARTY, and that the RELEASING PARTY will hold the above-named RELEASED PARTIES and any person, persons, organizations or corporations in privity with them, harmless of and from any and all claims by medical service providers, including hospital lien claims and Medicare or Medicaid-related claims. The RELEASING PARTY further agrees and understands that no medical treatment, or health care treatment of any kind or character on behalf of the RELEASING PARTY will be paid by the RELEASED PARTIES for bills incurred in the past or to be incurred at any time in the future.

The RELEASING PARTY hereby states and warrants that he is the sole owner of the claims which have been asserted and referenced above, and that such claims have not been assigned, encumbered or transferred. For the consideration recited above, the RELEASING PARTY will indemnify and hold harmless the RELEASED PARTIES described above and any person, persons, or organizations in privity with them, of and from any and all claims, demands, actions, or causes of action by any person or organization claiming an interest in the claims which the RELEASING PARTY has asserted, or the proceeds which are being paid pursuant to this settlement agreement, including payment of attorney's fees and expenses incurred in the making or defending of such claims. The RELEASING PARTY further stipulates and warrants that the payment made pursuant to this agreement constitutes a full satisfaction of all damages which the RELEASING PARTY has sustained in connection with the incident described above.

Any and all claims which are not specifically released herein, if any, are hereby assigned in full to the RELEASED PARTIES. The RELEASING PARTY stipulates that this settlement is a compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of the RELEASED PARTIES and person, persons, firms, organizations or corporations hereby released, by each of whom liability is expressly denied.

The RELEASING PARTY further agrees and warrants that he, his family, or any agents or representatives have not and shall not in the future disseminate any information regarding the allegations made against the RELEASED PARTIES, the amount of funds paid herein, the existence of this agreement, or any of the terms of this agreement to any person, organization or agency of any type include     ing any electronic or social media or in any way on the internet, it being the intent of the parties hereto that this agreement remain confidential. The RELEASING PARTY agrees not to publish directly or indirectly, any oral or written statement that is disparaging of, negative about or reflecting poorly upon Dollar General or any RELEASED PARTY. A breach of this portion of the agreement will be considered material and obligate the RELEASING PARTY to refund all amount paid herein including attorney's fees in the pursuit of such action.

This Release contains the entire agreement between the parties, and the terms of this Release are contractual and not a mere recital.

In making this agreement of compromise and settlement, the RELEASING PARTY has not relied upon any statement or representation pertaining to this matter made by the RELEASED PARTIES or any persons, firms, organizations or corporations who are hereby released, or by any person or persons representing them, or by any physician or surgeon by them employed. The RELEASING PARTY further states and warrants that he has fully understood the terms of this Release, has discussed it fully with persons and counsel of their choosing, and signed it of his own free act.

DATED this _____ day of _____, 20_____.


_____
(RELEASING PARTY)

Social Security #:_____

1

**DG 0007**

# CONFIDENTIAL

## RELEASE AND CONFIDENTIALITY AGREEMENT

Claim#: 201703217

THAT FOR AND IN CONSIDERATION of the sum of _____ five-hundred dollars _____ ($ 500 ), the receipt and sufficiency of which is hereby acknowledged and confessed, _____ Pearl Covey _____ (hereinafter the "RELEASING PARTY") does hereby compromise, settle, and fully release and forever discharge DOLLAR GENERAL CORPORATION, DOLGENCORP, LLC, DOLLAR GENERAL STORES, all other DOLLAR GENERAL-related companies or entities, successors, subsidiaries, agents, servants, insurers, contractors or employees (hereinafter, the "RELEASED PARTIES"), from any and all claims, demands, actions, or causes of action which the RELEASING PARTY have or may now or may in the future own or hold for damages or losses of any kind or character whatsoever, including, but not limited to any and all claims arising from any incident which occurred at a Dollar General store on or about _____ 4/12/2017 _____. This release, includes, but is not limited to, claims and/or causes of action for past and future legal and medical expenses, past and future physical pain, suffering and mental anguish, scarring, past and future loss of wages, earnings or earning capacity, property damage, attorneys' fees, any subrogation interest, past and future household services, punitive damages, damages for any violation of any state or federal statute or statutes, damages for any violation of any common law provision, and any other loss or damage of any kind or character whatsoever.

It is expressly understood and agreed that all bills for medical aid, hospital services, doctor services, chiropractic services, nursing, drugs and medicines have been paid or shall be paid by the RELEASING PARTY, and that the RELEASING PARTY will hold the above-named RELEASED PARTIES and any person, persons, organizations or corporations in privity with them, harmless of and from any and all claims by medical service providers, including hospital lien claims and Medicare or Medicaid-related claims. The RELEASING PARTY further agrees and understands that no medical treatment, or health care treatment of any kind or character on behalf of the RELEASING PARTY will be paid by the RELEASED PARTIES for bills incurred in the past or to be incurred at any time in the future.

The RELEASING PARTY hereby states and warrants that he is the sole owner of the claims which have been asserted and referenced above, and that such claims have not been assigned, encumbered or transferred. For the consideration recited above, the RELEASING PARTY will indemnify and hold harmless the RELEASED PARTIES described above and any person, persons, or organizations in privity with them, of and from any and all claims, demands, actions, or causes of action by any person or organization claiming an interest in the claims which the RELEASING PARTY has asserted, or the proceeds which are being paid pursuant to this settlement agreement, including payment of attorney's fees and expenses incurred in the making or defending of such claims. The RELEASING PARTY further stipulates and warrants that the payment made pursuant to this agreement constitutes a full satisfaction of all damages which the RELEASING PARTY has sustained in connection with the incident described above.

Any and all claims which are not specifically released herein, if any, are hereby assigned in full to the RELEASED PARTIES. The RELEASING PARTY stipulates that this settlement is a compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of the RELEASED PARTIES and person, persons, firms, organizations or corporations hereby released, by each of whom liability is expressly denied.

The RELEASING PARTY further agrees and warrants that he, his family, or any agents or representatives have not and shall not in the future disseminate any information regarding the allegations made against the RELEASED PARTIES, the amount of funds paid herein, the existence of this agreement, or any of the terms of this agreement to any person, organization or agency of any type include      ing any electronic or social media or in any way on the internet, it being the intent of the parties hereto that this agreement remain confidential. The RELEASING PARTY agrees not to publish directly or indirectly, any oral or written statement that is disparaging of, negative about or reflecting poorly upon Dollar General or any RELEASED PARTY. A breach of this portion of the agreement will be considered material and obligate the RELEASING PARTY to refund all amount paid herein including attorney's fees in the pursuit of such action.

This Release contains the entire agreement between the parties, and the terms of this Release are contractual and not a mere recital.

In making this agreement of compromise and settlement, the RELEASING PARTY has not relied upon any statement or representation pertaining to this matter made by the RELEASED PARTIES or any persons, firms, organizations or corporations who are hereby released, or by any person or persons representing them, or by any physician or surgeon by them employed. The RELEASING PARTY further states and warrants that he has fully understood the terms of this Release, has discussed it fully with persons and counsel of their choosing, and signed it of his own free act.

DATED this 23 day of April , 20 17 .

_Pearl Curry_
(RELEASING PARTY)

Social Security #: 441- 46 - 3323

_want shop there no more_

_I his is a negligence_
_of keeping entrance to this_
_store an outside upkeep_          1

**DG 0008**

# *CONFIDENTIAL*

**From:** Mike Vallone <mvallone@dollargeneral.com>
**Sent:** Friday, April 14, 2017 11:22 AM
**To:** Anne Marie Heisse <aheisse@dollargeneral.com>
**Subject:** Sidewalk pics/Store 7171

We have a store that is having a large amount of accidents on a sidewalk in disrepair. See pictures attached.

**From:** Mike Robb
**Sent:** Friday, April 14, 2017 11:20 AM
**To:** Mike Vallone <mvallone@dollargeneral.com>
**Subject:** RE: Sidewalk pics/Store 7171

Sent from my Windows Phone

**From:** Mike Vallone
**Sent:** 4/14/2017 11:19 AM
**To:** Mike Robb
**Subject:** Sidewalk pics/Store 7171

Can you please forward me the pictures of the sidewalk area where the claimant fell on 4/12/2017? ☺
Thanks!

Mike Vallone
Risk Management
Dollar General Corporation
Office: 1-800-456-9446 ext 4382
Direct: 615-855-4382
Fax: 615-694-5084
Email: MVallone@Dollargeneral.com



DG 0010



DG 0011



DG 0012



**DG 0013**

# *CONFIDENTIAL*

| User Type | Name | Username | Create Date | Note |
|---|---|---|---|---|
| DM | Charles Robb | mrobb | 9/3/2018 9:11:04 AM | << Ticket Status was changed from OPEN to CLOSED >> Work was completed. Thank you for your partnership |
| DM | Charles Robb | mrobb | 8/7/2018 5:45:24 AM | << Ticket Priority was changed from ESCALATE to CRITICAL >> Team, Customers are posting on social media how bad our sidewalks is. We have had 8 customers get hurt over the last 14 months. We need this addressed. We receive customer complaints DAILY. Its not fair to the customer or the employees who have to explain to customer why its still not fixed ETA?? |
| STORE | Anne Richey | | 8/3/2018 4:05:53 PM | business has been extra slow because of the sidewalk issue. it should not take this long to get fixed. |
| DM | Charles Robb | mrobb | 7/30/2018 11:18:55 AM | << Ticket Priority was changed from CRITICAL to ESCALATE >> ETA? |
| DM | Charles Robb | mrobb | 7/26/2018 12:10:01 PM | << Ticket Priority was changed from NORMAL to CRITICAL >> Team, We need this addressed ASAP. |
| STORE | Anne Richey | | 7/24/2018 12:16:46 PM | please update, this is a danger to customer safety |
| STORE | Anne Richey | | 6/27/2018 4:15:39 PM | got another complaint about the sidewalk from customer today 6/27/2018. |
| VENDOR | Fischer | Fischer | 6/6/2018 12:50:12 PM | photos sent to assess and quote |
| VENDOR | Fischer | Fischer | 6/4/2018 12:45:06 PM | Recoded ticket to Parking Lot and Sidewalk DG in MP. Solving out FS work order. |
| DM | Charles Robb | mrobb | 6/4/2018 8:20:09 AM | << Ticket Priority was changed from ESCALATE to CRITICAL >> We need this addressed ASAP |
| SSC | System Generated | System | 6/4/2018 8:19:27 AM | << Ticket Priority automatically set to ESCALATE by the System >> |
| DM | Charles Robb | mrobb | 6/4/2018 8:19:27 AM | I have put in several tickets for this broken sidewalk yet they disappear. We had yet another customer fall and bust their nose open. This is the 3rd time 12 months we have had a customer fall. Can we please get this fixed asap? The buckle is so big it takes up over half the sidewalk. Thank you |

CONFIDENTIAL

| User Type | Name | Username | Create Date | Note |
|---|---|---|---|---|
| VENDOR | Fischer | Fischer | 7/10/2018 1:15:08 PM | See ticket DG07171180604001 |
| SSC | Karen Mixon | kmixon | 7/12/2017 3:22:04 PM | << Ticket Type was changed from PARKING LOT AND SIDEWALK to PARKING LOT AND SIDEWALK - DG >> redirecting ticket |
| VENDOR | IIM | IIM | 6/14/2016 11:34:41 AM | IIM is placing this call in the Parked status. This call will be bundled with other calls in a routed service. Please send IIM a note through respond if you have any questions. Thank you! |
| STORE | Janelle Verstraete | | 6/14/2016 11:30:39 AM | sidewalk is very uneven and broken in areas that causes customers to trip over .had a customer fall over it that caused them to get hurt |

DG 0015

**CONFIDENTIAL**

| User Type | Name | Username | Create Date | Note |
|---|---|---|---|---|
| VENDOR | Fischer | Fischer | 6/6/2018 4:10:07 PM | Flipped to Sidewalk DG. |
| STORE | Anne Richey | | 6/6/2018 12:49:03 PM | the sidewalk that wraps around the building has been cracked very badly for years and customers continue to trip over side walk and weve had many bad accidents happen to these people over the years but this issue to fixing the sidewalk continues to be ignored. one day I feel like someone will sue |

*CONFIDENTIAL*

| User Type | Name | Username | Create Date | Note |
|---|---|---|---|---|
| SSC | Karen Mixon | kmixon | 7/12/2017 3:01:53 PM | << Ticket Status was changed from OPEN to CLOSED >> DG07171160614001 |
| SSC | Tanasha Williams | twilliam | 4/14/2017 2:16:58 PM | << Ticket Priority was changed from NORMAL to CRITICAL >> . |
| STORE | Janelle Verstraete | | 4/12/2017 4:59:12 PM | sidewalk is all buckled up and holes in sidewalk .very dangerous to customers .I had a customer today trip and hit her head . |

**DG 0017**

To: Shelly Hooper; 'Michael Grundon'
Subject: RE: #7171 Pratt, KS (PD)

Is this attached bid approved?

-----Original Message-----
From: Shelly Hooper [mailto:shooper@dollargeneral.com]
Sent: Wednesday, April 15, 2009 2:04 PM
To: Michael Grundon
Cc: dore@innovationsmgmt.org
Subject: RE: #7171 Pratt, KS (PD)

Ok..let get the side walk done for now..do not worry about the rest at this time.. thank
you


Shelly Hooper
Facilities Coordinator
ph# 615-855-4763
Fax 615-855-8116
shooper@dollargeneral.com

-----Original Message-----
From: Michael Grundon [mailto:michaelg@innovationsmgmt.org]
Sent: Wednesday, April 15, 2009 3:54 PM
To: Shelly Hooper
Subject: RE: #7171 Pratt, KS (PD)

These are the pictures that the tech has sent me. There is only one for the sidewalk, but
the parking lot issue does not need to be re-done because the repairs made work. Please
let me know if you need anything else.

Thank you,

Michael Grundon
Account Manager

Innovations In Management
PO Box 299
Newberg, Oregon 97132

Ph: 503-925-2059
Fax: 503-925-2021

Innovationsmgmt.org


-----Original Message-----
From: Shelly Hooper [mailto:shooper@dollargeneral.com]
Sent: Wednesday, April 15, 2009 12:40 PM
To: Michael Grundon
Subject: RE: #7171 Pratt, KS (PD)

Michael,
Did you get the pictures on this yet.. we will have to do VERY basic repairs to only the
sidewalk and the hole where the tricks deliver..

Shelly Hooper
Facilities Coordinator
ph# 615-855-4763
Fax 615-855-8116
shooper@dollargeneral.com

2

DG 0019

1      **leaky faucet, add comments and attempt to escalate**

2      **the ticket.**

3   Q   All the while keeping the store open and having

4      customers walk on and across the sidewalk?

5   A   **Yes.**

6   Q   Okay.  Even though you would concede that this is

7      a dangerous condition.

8   A   **I think it's unpleasing.  Dangerous I guess**

9      **depends on the conditions.**

10  Q   You don't concede that this sidewalk appears to be

11     dangerous in its condition?

12             MR. PHELPS:  Object to form.

13  A   **Again, it -- to me it depends on -- I've walked**

14     **across that sidewalk several times and I never**

15     **tripped on anything.**

16  Q   Okay.  So you had personal, firsthand knowledge of

17     the condition of the sidewalk before Ms. Walters

18     fell.

19  A   **Yes, I've seen the crack in the sidewalk.**

20  Q   Well, you've seen not just the crack, you've seen

21     the missing concrete, you've seen the separated

22     concrete, you've seen the sloping part of the

23     concrete because it's broken off, you've seen all

24     those things.

25  A   **Yes, yes.**



This transcript was exported on Jun 03, 2019 - view latest version here.

Debbie Lowe:        00:01        Hi Suzanne, my name is Debbie Lowe. I filed a customer incident report at the [inaudible 00:00:10] Kansas, I filed it on the 13th of this month. The date of the incident was the 12th. I broke my toe and I don't... I'm not what's going on with my hip. I was meaning to find out why [inaudible 00:00:25]. My cell number is 620 388 7655. Thank you.

PLAINTIFF'S
EXHIBIT
6

DEF000001

This transcript was exported on Jun 03, 2019 - view latest version here.

| Suzanne Pete: | 00:00 | This is Suzanne Pete with Dollar General risk management. Today's date is June 15th, 2016. It is Wednesday. The time now is approximately 4:31 PM Central Standard Time. I'm speaking with Debbie Lowe related to an incident that occurred on or around 6-12-2016 in Pratt, Kansas. |
| --- | --- | --- |
| Suzanne Pete: | 00:24 | Ms. Lowe, may I please have your permission to record our conversation? |
| Debbie Lowe: | 00:28 | Yes. |
| Suzanne Pete: | 00:28 | Thank you, ma'am. Are you under the influence of any medications or substances that would affect your ability to give a statement? |
| Debbie Lowe: | 00:35 | No, ma'am. |
| Suzanne Pete: | 00:36 | Okay. Thank you. And, um, may I have your permission to- to take this statement for your claim? |
| Debbie Lowe: | 00:44 | Yes. |
| Suzanne Pete: | 00:45 | Thank you. Would you please state your full name and give the spelling of your last name. |
| Debbie Lowe: | 00:50 | First name is Debbie. Middle name is Lynn. Last name is Lowe, L-O-W-E. |
| Suzanne Pete: | 00:56 | All right. And you receive your mail at what address, please? |
| Debbie Lowe: | 01:02 | At 910 Brendon Court, Pratt, Kansas. |
| Suzanne Pete: | 01:09 | Is that 67124? |
| Debbie Lowe: | 01:10 | Yes. |
| Suzanne Pete: | 01:10 | Okay, and it's Brendon, B-R-E-N-D-O-N, rather than Brandon? |
| Debbie Lowe: | 01:16 | Yeah, B-R-E-N-D-O-N. |
| Suzanne Pete: | 01:18 | All right. Thank you. We have a phone number of (620) 388-7655. Is that correct? |
| Debbie Lowe: | 01:26 | Yes, that's my cell number. |

DEF000002

This transcript was exported on Jun 03, 2019 - view latest version here.

| Suzanne Pete: | 01:27 | Okay. Is there any alternate number that you would like me to add to your file? |
|---|---|---|
| Debbie Lowe: | 01:30 | Uh, no. |
| Suzanne Pete: | 01:36 | Okay. And do you know the approximate date and time of the incident? |
| Debbie Lowe: | 01:38 | Uh, it was June 12th, uh, 2016 at approximately around, like, 4:20 PM. |
| Suzanne Pete: | 01:45 | Okay. And which location of Dollar General was involved? |
| Debbie Lowe: | 01:53 | Uh, there's only one Dollar General in Pratt. |
| Suzanne Pete: | 01:56 | Only one in Pratt? Okay. |
| Debbie Lowe: | 01:57 | Yeah. |
| Suzanne Pete: | 01:57 | All right. Um, is that the one at East First Street? |
| Debbie Lowe: | 02:03 | Yes. |
| Suzanne Pete: | 02:03 | Okay. All right. And wh- on this particular day were you shopping alone or with someone else? |
| Debbie Lowe: | 02:09 | I had, um, actually had my daughter with me. |
| Suzanne Pete: | 02:13 | Okay. And was she also injured? |
| Debbie Lowe: | 02:18 | No. |
| Suzanne Pete: | 02:18 | Okay. And was she a witness? |
| Debbie Lowe: | 02:23 | Do what? |
| Suzanne Pete: | 02:24 | Was she a witness? |
| Debbie Lowe: | 02:26 | Yes, ma'am. |
| Suzanne Pete: | 02:27 | Okay. And what is the name of the witness and the age of the witness? |
| Debbie Lowe: | 02:33 | Uh, her first name is Tiffany, T-I-F-F-A-N-Y. Uh, she will be 20- 23 this year. |

This transcript was exported on Jun 03, 2019 - view latest version here.

| Suzanne Pete: | 02:46 | Okay. She's, she's not a minor. She's an adult? |
| Debbie Lowe: | 02:48 | Oh, no, no, huh-uh. |
| Suzanne Pete: | 02:49 | Alrighty. Okay. And her last name is also Lowe? |
| Debbie Lowe: | 02:53 | Uh, her last name is Henson. |
| Suzanne Pete: | 02:55 | Henson. |
| Debbie Lowe: | 02:56 | H-E-N-S-O-N. |
| Suzanne Pete: | 02:58 | Okay. Thank you. Alrighty. And, um, thus far did you miss any time from a job, um, with wages related to this incident? |
| Debbie Lowe: | 03:08 | No, ma'am. I showed up for work every day regardless of how it hurt. |
| Suzanne Pete: | 03:13 | Okay. Working- working with the injury. Okay. |
| Debbie Lowe: | 03:16 | [inaudible 00:03:16]. |
| Suzanne Pete: | 03:16 | And where are you employed? |
| Debbie Lowe: | 03:19 | Uh, Kwik Shop, it's a convenience store. |
| Suzanne Pete: | 03:23 | Okay. Okay. And, um, have you sought any medical attention, uh, related to this incident? |
| Debbie Lowe: | 03:35 | Uh, no, not yet, because I wasn't sure, uh, what I was supposed to do about that. |
| Suzanne Pete: | 03:45 | Okay. And please describe for me what you were doing and- and what happened actually at the store. As much detail as you can remember, please. |
| Debbie Lowe: | 03:52 | Well, my daughter and I pulled up [inaudible 00:03:54] in front of the store, and it's ... Part of the- the sidewalk is, like, uneven. One part's a little bit higher than the other. I was walking around and my- my shoe caught it. I remember going down on my hands. Well, when I went down on my hands and my knees my- my toe ... I- I don't know how else to- to describe it. My foot stayed still as I went down. It pretty much bent my toes. And my daughter seen that I had fell, and I kind of started to cry because it hurt. She comes running back over, and wanting to |

This transcript was exported on Jun 03, 2019 - view latest version here.

|  |  | know if I needed to go sit down and I told her no. I needed to stand up against the building because my- my foot hurt. |
|---|---|---|
| Debbie Lowe: | 04:42 | And I- we went inside and I asked the two girls that were working, I told them, I said, "You know, you guys really need to get that cement, uh, sidewalk fixed out there." I said, "Because I just fell." And I asked one of them how, you know, how they do, like, a customer incident report and they're, "I don't know." They had no clue what to do. And they told me that the best bet was to contact store manager [Janelle 00:05:15] the next day, so that's when I contacted her on the 13th. |
| Suzanne Pete: | 05:20 | Okay. Okay. Okay, and you spoke to the store manager, Janelle, on the 13th? Okay. |
| Debbie Lowe: | 05:29 | Yeah. |
| Suzanne Pete: | 05:29 | And was the incident report, um, made at that, on that day? |
| Debbie Lowe: | 05:33 | Yeah, it was about 8:00, 8:05, uh, AM that morning. |
| Suzanne Pete: | 05:37 | Okay. Okay. All right, and, um, when you went down on your hands and knees, you said your shoe caught something, what did it actually catch? |
| Debbie Lowe: | 05:53 | The one part of the- the cement is raised up a little bit higher than the other where people walk back and forth. |
| Suzanne Pete: | 06:03 | Okay. Uh, is it just, like, poured that way? Like expansion joints between [crosstalk 00:06:06] sidewalk or- or something, um, broken? Or ... |
| Debbie Lowe: | 06:10 | Uh, it, I want to say it's, like, broken. Okay. You know how when tree roots start going underneath cement, how one part will raise up higher? That's the only way I can describe it. |
| Suzanne Pete: | 06:20 | Okay. About how much higher would you say that it was? |
| Debbie Lowe: | 06:28 | I don't know, maybe a quarter of an inch. |
| Suzanne Pete: | 06:29 | Okay. Okay. Do you recall what footwear you had on? |
| Debbie Lowe: | 06:40 | I had, actually, uh, my tennis shoes. |
| Suzanne Pete: | 06:44 | Okay. And just hit the, hit the toe of it and- |

This transcript was exported on Jun 03, 2019 - view latest version here.

| Debbie Lowe: | 06:48 | Yeah. |
|---|---|---|
| Suzanne Pete: | 06:49 | ... went down on your hands and knees. What- what are the areas of injury? |
| Debbie Lowe: | 06:54 | Uh, my- my left, well, my little toe on my right foot or my little toe on ... All the toes have, uh, started bruising except my big toe and I'm having troubles with my left hip. |
| Suzanne Pete: | 07:11 | Okay. Okay. What about your hands and your knees? |
| Debbie Lowe: | 07:19 | Well, my el- ... There's a slight bruise on the palm of my hand but it was fine. I mean, my knees, my knees are okay but it, the initial contact when I went down, it, like, really jolted everything so ... |
| Suzanne Pete: | 07:38 | Okay. Did it break any personal items? |
| Debbie Lowe: | 07:43 | No. |
| Suzanne Pete: | 07:44 | Okay. No glasses or- or, um, [crosstalk 00:07:47]- |
| Debbie Lowe: | 07:46 | Oh, no. No. Huh-uh. |
| Suzanne Pete: | 07:48 | ... phone or anything like that? Okay, nothing broken. Okay, good. All right. Okay. Um, and you had mentioned that you've not gone for medical attention at this time because you were not sure what to do. Um, who is your family physician? If ... Well, where- where will you go? If you do determine that you need to go. |
| Debbie Lowe: | 08:11 | Uh, so, when I need to go in, her Kelsi, K-E-L-S-I, last name is Hott, H-O-T-T. |
| Suzanne Pete: | 08:20 | Okay. That's your primary care physician? |
| Debbie Lowe: | 08:22 | Yes. |
| Suzanne Pete: | 08:23 | Okay. And approximately how long has she been your treating physician? |
| Debbie Lowe: | 08:25 | Uh, I don't know, but at least a year and a half. |
| Suzanne Pete: | 08:31 | Okay, okay. Can you tell ... I know it's just been a few days and sometimes, you know, you actually get a little more sore before it starts to, you know, feel better, but, um, is it actually feeling |

DEF000006

This transcript was exported on Jun 03, 2019 - view latest version here.

|  |  | about the same or getting a little worse or getting a little better at this point? Or can you even tell? |
|---|---|---|
| Debbie Lowe: | 08:51 | Um, uh, there was a little bit more stiffness- stiffness in my left hip. |
| Suzanne Pete: | 08:56 | Okay. |
| Debbie Lowe: | 08:57 | And, of course, my toe, I mean, that's just, that's going to be sore a while because- |
| Suzanne Pete: | 09:03 | Okay. |
| Debbie Lowe: | 09:03 | ... I just got to keep working. |
| Suzanne Pete: | 09:06 | Okay. Okay. Um, have you ever been, uh, our guest at this store before? |
| Debbie Lowe: | 09:17 | Oh, yeah, many a times. |
| Suzanne Pete: | 09:18 | Okay. Have you had trouble with this area of the sidewalk before? |
| Debbie Lowe: | 09:25 | I mean, I've- I've tripped over it before but I'd never fallen. |
| Suzanne Pete: | 09:39 | Okay. Okay. And, was there, is there anything that was contributory other than the, um, the sidewalk? |
| Debbie Lowe: | 09:51 | Uh- |
| Suzanne Pete: | 09:53 | No merchandise or anything else involved? |
| Debbie Lowe: | 09:55 | Oh, no. Huh-uh. |
| Suzanne Pete: | 09:57 | Okay. Okay. In the past, have you had any injuries or conditions involving your hands? Um, I'm just [inaudible 00:10:09] I'm just going to go over each body part in turn involving your hands, yes or no? |
| Debbie Lowe: | 10:15 | Uh, I have arthritis real bad. |
| Suzanne Pete: | 10:18 | Okay. Um, and your knees, yes or no? |
| Debbie Lowe: | 10:24 | Uh, arthritis a little bit in the knees. |
| Suzanne Pete: | 10:27 | Okay. Your hip, yes or no? |

DEF000007

This transcript was exported on Jun 03, 2019 - view latest version here.

| Debbie Lowe: | 10:29 | Um, I hadn't really had problems with the left one until I fell, but, I mean, I've had problems with the right one. |
|---|---|---|
| Suzanne Pete: | 10:44 | Sorry. There's a little bit of ... It's not real distinct. I think I heard you say that you'd not had problems with the left one, but something about the right one but I couldn't catch what you said. I'm sorry. |
| Debbie Lowe: | 10:51 | Oh, I've- I've had problems with the right one, you know, for a while, but then after the fall is when the left one started hurting. Because I noticed when I have to, uh, cough, it, I don't know it's kind of like a sh- like a shooting pain up there by, like, the hip bone, and I- I have no clue what's going on. |
| Suzanne Pete: | 11:12 | Okay. In- in the right hip, is it arthritis or, um, have you had a [inaudible 00:11:18] or- |
| Debbie Lowe: | 11:18 | [crosstalk 00:11:18]. It's arthritis in the hip. |
| Suzanne Pete: | 11:21 | Okay. Does Dr., um, Hott treat you for your arthritis condition? |
| Debbie Lowe: | 11:30 | Uh, yeah. She knows. I'm on, um, naproxen. That's, like, an anti-inflammatory and that's about it. |
| Suzanne Pete: | 11:38 | Okay. And, I think, the last body part was the toes and feet. |
| Debbie Lowe: | 11:46 | Uh, normally they're- they're doing okay and, you know, until I, you know, until I broke the toe. |
| Suzanne Pete: | 11:54 | Okay. No prior treatments or- or, um, injuries involving the toes or feet? |
| Debbie Lowe: | 12:01 | I broke, uh, another toe here about three years ago. |
| Suzanne Pete: | 12:09 | Was that on the left foot as well or was that the other foot? |
| Debbie Lowe: | 12:11 | Uh, that was on the- the- the right, the right foot. Just the toe next to my little toe. |
| Suzanne Pete: | 12:15 | Okay. Okay. Okay. And did that one heal up okay, the fracture there? |
| Debbie Lowe: | 12:31 | Yeah. It took a while. |
| Suzanne Pete: | 12:32 | They didn't have to do any surgery or anything on it? |

DEF000008

This transcript was exported on Jun 03, 2019 - view latest version here.

| Debbie Lowe: | 12:34 | Oh, no. Huh-uh. |
| Suzanne Pete: | 12:36 | Okay. Okay. All right. Um, in the past, have there been any claims, either, like, worker's compensation or motor vehicle accident or liability? |
| Debbie Lowe: | 12:51 | Uh, I had a work comp claim when, I don't even remember how long ago it was, when I was employed at Dillon. I had twisted my ankle. |
| Suzanne Pete: | 13:03 | Okay. |
| Debbie Lowe: | 13:03 | Um. I had worked in the bakery part. |
| Suzanne Pete: | 13:04 | Okay. |
| Debbie Lowe: | 13:05 | Um. I haven't been there for a year. It's probably three years. |
| Suzanne Pete: | 13:09 | Okay. |
| Debbie Lowe: | 13:11 | [inaudible 00:13:11] four- four or five years ago. |
| Suzanne Pete: | 13:15 | Okay. Were you able to return to your job after that injury? |
| Debbie Lowe: | 13:22 | Yes. |
| Suzanne Pete: | 13:23 | Okay. And are there any other conditions for which you, um, see a physician or take medications, other than the arthritis and naproxen that we discussed already? |
| Debbie Lowe: | 13:42 | Uh, no. Just mainly for the- the arthritis stuff. |
| Suzanne Pete: | 13:42 | Okay. Okay. Um, when you were, um ... Were you on your way into the store, Ms. Lowe, when it happened or on your way out? |
| Debbie Lowe: | 13:58 | No, my daughter and I was on the way in. |
| Suzanne Pete: | 14:00 | On the way in, okay. Okay. And, um, was she, did she pass, uh, ahead of you or was she behind you or- or were you walking side by side? |
| Debbie Lowe: | 14:12 | We, uh, we pulled ... Uh, the store faces, uh, south. |
| Suzanne Pete: | 14:18 | Okay. |

This transcript was exported on Jun 03, 2019 - view latest version here.

| Debbie Lowe: | 14:20 | She got out on the passenger side and started going towards the door and I come around and she- she heard- she heard my hollering and that's when she stopped and turned around and seen that I was on the ground and- |
| Suzanne Pete: | 14:38 | Okay. All right. And are, um, are you aware if there were any other, uh, customers or employees who were also a witness to your incident? |
| Debbie Lowe: | 14:50 | There- there was a customer that had seen the whole thing, didn't do anything but just kind of looked, turned back around and then walked on in the store, didn't say nothing. |
| Suzanne Pete: | 15:05 | Okay. Okay. Is there anything else that you would like to add to your statement that I may not have thought to ask you? |
| Debbie Lowe: | 15:15 | Uh, no. |
| Suzanne Pete: | 15:20 | Okay. In that case, ma'am, let me go ahead and confirm with you, um, did you understand that I was taking your recorded statement for your claim? |
| Debbie Lowe: | 15:30 | Yes. |
| Suzanne Pete: | 15:30 | Thank you. Did I have your permission to do that? |
| Debbie Lowe: | 15:34 | Yes, yes. Yes, ma'am. |
| Suzanne Pete: | 15:35 | Thank you. And have you understood the questions that you were asked? |
| Debbie Lowe: | 15:40 | Yes. |
| Suzanne Pete: | 15:40 | And have your answers been truthful and complete to the best of your ability? |
| Debbie Lowe: | 15:44 | Yes, ma'am. |
| Suzanne Pete: | 15:45 | Okay. If you'll please hold for me just a moment, I'm going to go ahead and turn off the recorded statement. |
| Debbie Lowe: | 15:49 | Okay. |

DEF000010

| | | |
|---|---|---|
| 1 | MR. PHELPS:  Object to form. | 00:36:15 |
| 2 | THE WITNESS:  The employees that we hire | 00:36:16 |
| 3 | are responsible for the day-to-day running of the | 00:36:19 |
| 4 | locations and not for maintenance and repairs. | 00:36:23 |
| 5 | BY MR. BRETZ: | 00:36:31 |
| 6 | Q.    And I'm asking something just a little bit | 00:36:31 |
| 7 | different. | 00:36:33 |
| 8 | MR. BRETZ:  Could you read that back, | 00:36:34 |
| 9 | please? | 00:36:36 |
| 10 | (WHEREUPON, the record was read as | 00:36:36 |
| 11 | requested.) | 00:36:52 |
| 12 | MR. PHELPS:  Same objection. | 00:36:52 |
| 13 | THE WITNESS:  I feel like my answer's the | 00:36:54 |
| 14 | same.  I guess I'm not understanding the -- | 00:36:59 |
| 15 | BY MR. BRETZ: | 00:37:02 |
| 16 | Q.    Ultimately it's Dollar General's decision as | 00:37:02 |
| 17 | to whether to use a vendor or whether to use its own | 00:37:05 |
| 18 | employees to do maintenance and repairs, true? | 00:37:09 |
| 19 | A.    True. | 00:37:12 |
| 20 | Q.    And it's Dollar General's decision as to how | 00:37:18 |
| 21 | much supervision to provide over vendors that Dollar | 00:37:31 |
| 22 | General chooses to use, correct? | 00:37:36 |
| 23 | A.    Correct. | 00:37:39 |
| 24 | Q.    And if a vendor's not doing a good job, | 00:37:41 |
| 25 | Dollar General has the ability to have the vendor | 00:37:45 |

PLAINTIFF'S
EXHIBIT
7

| | | |
|---|---|---|
| 1 | redo it or hire a different vendor to do it? | 00:37:49 |
| 2 | A.      Correct. | 00:37:54 |
| 3 | Q.      And whether that's building a wall or whether | 00:37:55 |
| 4 | that's replacing a sidewalk or whether it's replacing | 00:37:58 |
| 5 | tile in the store, ultimately Dollar General makes | 00:38:00 |
| 6 | the decision as to what's being done, correct? | 00:38:03 |
| 7 | A.      Correct. | 00:38:06 |
| 8 | Q.      Dollar General, both at the local store level | 00:38:07 |
| 9 | and at the national corporate level, knew about the | 00:38:50 |
| 10 | condition of the sidewalk at the Pratt, Kansas, store | 00:38:55 |
| 11 | before June 3rd of 2018, correct? | 00:39:00 |
| 12 | A.      Correct. | 00:39:04 |
| 13 | Q.      The employees at the local level had put in | 00:39:05 |
| 14 | multiple tickets to get the sidewalk fixed before | 00:39:12 |
| 15 | June 3rd of 2018, correct? | 00:39:16 |
| 16 | A.      There had been tickets, correct. | 00:39:18 |
| 17 | Q.      And photos of the sidewalk had been sent to | 00:39:20 |
| 18 | the corporate level here in Nashville prior to | 00:39:25 |
| 19 | June 3, 2018, correct? | 00:39:30 |
| 20 | A.      May I look and just confirm that date when | 00:39:34 |
| 21 | those photos were received? | 00:39:41 |
| 22 | Q.      Please. | 00:39:42 |
| 23 | A.      And may I ask -- hang on.  That is correct. | 00:39:44 |
| 24 | Q.      For instance, I'm going to show you what's | 00:40:04 |
| 25 | been marked as DG-32 and there is an e-mail on my | 00:40:08 |

| | | |
|---|---|---|
| 1 | BY MR. BRETZ: | 03:22:02 |
| 2 | Q.     And if the vendor didn't do it, do you | 03:22:02 |
| 3 | concede it was still Dollar General's duty, | 03:22:05 |
| 4 | responsibility, to take care of the sidewalk? | 03:22:08 |
| 5 | MR. PHELPS:  Object to form. | 03:22:11 |
| 6 | THE WITNESS:  We wanted to take care of | 03:22:13 |
| 7 | the sidewalk.  The intent was to take care of the | 03:22:15 |
| 8 | sidewalk. | 03:22:18 |
| 9 | BY MR. BRETZ: | 03:22:18 |
| 10 | Q.     I didn't ask what you wanted or your intent, | 03:22:18 |
| 11 | my question was something different. | 03:22:21 |
| 12 | MR. BRETZ:  Can you read it back? | 03:22:22 |
| 13 | (WHEREUPON, the record was read as | 03:22:23 |
| 14 | requested.) | 03:22:36 |
| 15 | MR. PHELPS:  Object to form. | 03:22:36 |
| 16 | THE WITNESS:  I concede that Dollar | 03:22:38 |
| 17 | General was still responsible to make any necessary | 03:22:40 |
| 18 | repairs. | 03:22:42 |
| 19 | BY MR. BRETZ: | 03:23:17 |
| 20 | Q.     In comparison to the profits made by Dollar | 03:23:18 |
| 21 | General in the years before Ms. Walters fell, the | 03:23:26 |
| 22 | cost and inconvenience of fixing the sidewalk is | 03:23:30 |
| 23 | minimal, true? | 03:23:37 |
| 24 | MR. PHELPS:  Object to form. | 03:23:38 |
| 25 | THE WITNESS:  True. | 03:23:40 |

```
 1    scope.                                                    03:30:48

 2              THE WITNESS:  I think we have established        03:30:50

 3    it was Dollar General's responsibility to fix.            03:30:52

 4              MR. BRETZ:  No other questions.                  03:30:55

 5              MR. PHELPS:  She'll read and sign.               03:30:56

 6              THE REPORTER:  Did you want to order             03:30:58

 7    this?                                                      03:31:03

 8              MR. BRETZ:  I do.  Original and mini.            03:31:05

 9              MR. PHELPS:  Copy, electronic.                   03:31:13

10              FURTHER DEPONENT SAITH NOT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Q    Okay.  When you went outside, did you see that
2        she'd fallen on the sidewalk?
3   **A    I -- I saw that she -- I didn't know where she**
4        **fell because she was standing up.**
5   Q    Okay.  Did she tell you what happened?
6   **A    That's what she did, she told me what happened.**
7   Q    And what did she tell you?
8   **A    She just told me that she tripped on the sidewalk.**
9        **She didn't tell me how, she just said that she**
10       **tripped on the sidewalk.**
11  Q    Given that people had been telling you four or
12       five times a month the whole time you worked there
13       that there were problems with the sidewalk, and
14       given your own observations of the sidewalk, when
15       Ms. Walters told you that she'd tripped on the
16       sidewalk, was it any surprise to you that that had
17       happened?
18            MR. PHELPS:  Object to form.
19  **A    No surprise whatsoever.**
20  Q    Why was it no surprise whatsoever?
21            MR. PHELPS:  Same objection.
22  **A    I guess I -- somebody -- I mean, it was no**
23       **surprise 'cause where she fell, it was probably**
24       **the worst part of the crack.**
25  Q    And there where she fell was the crack that we've



PLAINTIFF'S
EXHIBIT

8

1   **A   Yes.**

2   Q   And if someone's carrying something in front of

3       them, whether it's a big box or whether it's

4       flower pots that they're carrying in front of

5       them, that may obstruct their vision of seeing the

6       concrete that's right in front of their feet,

7       true?

8               MR. PHELPS:   Object to form and

9       foundation.

10  **A   True.**

11  Q   So when you couple all of those things together,

12      the broken concrete, the merchandise that's

13      displayed against the wall to attract people's

14      attention, the cars that are parked on the parking

15      lot, the funneling across the broken concrete, and

16      carrying things, when you add all of those things

17      together, it can create very dangerous conditions

18      for customers such as Ms. Walters, true?

19              MR. PHELPS:   Object to form.

20  **A   True.**

21  Q   And is that one of the reasons that you had been

22      trying before Ms. Walters fell to get Dollar

23      General corporate to fix this sidewalk where other

24      people had fallen?

25  **A   I do care about my customers and, you know, I -- I**

PLAINTIFF'S
EXHIBIT
9

1      with that question.  I appreciate your asking for

2      clarification.  You're familiar with the condition

3      of the sidewalk in front of the Dollar General

4      store from 2016 to 2018, aren't you?

5   A   **Yes.**

6   Q   And, in fact, you're familiar with the sidewalk --

7      the condition of the sidewalk in front of the

8      Pratt Dollar General store from roughly 2013 up

9      until the time that Jane Walters fell in June of

10      '18, correct?

11  A   **Yes.**

12  Q   And so that would be about five years before she

13      fell?

14  A   **Yes.**

15  Q   And in those five years, was the sidewalk roughly

16      the same, approximately the same?

17  A   **Yeah.**

18  Q   It was cracked, it was broken, it had part of it

19      that was sloped down from a crack toward the

20      sidewalk -- or to the parking lot, had pieces of

21      concrete that were missing, correct?

22  A   **I don't know about pieces.  I know it was -- I**

23      **know it had been cracked and slanted down.**

24  Q   And it was in generally the same condition those

25      whole five years before Jane Walters fell, true?



PLAINTIFF'S
EXHIBIT

10

1   A   Yeah.

2   Q   And it was dangerous to customers and employees

3       during that entire time, true?

4           MR. PHELPS:   Object to form, foundation.

5   A   Yeah, it could have been.

6   Q   It was dangerous because someone could trip on a

7       piece of broken or cracked sidewalk and fall and

8       hit their head and die, true?

9           MR. PHELPS:   Object to form.

10  A   I mean, yeah, possibly.

11  Q   And it was even more dangerous because Dollar

12      General displayed merchandise on the sidewalk for

13      the purpose of drawing people's attention to the

14      merchandise and you knew that people might forget

15      about the sidewalk or not pay attention to the

16      sidewalk and be injured, true?

17          MR. PHELPS:   Object to form.

18  A   Possibly.

19  Q   Would you agree that it's reckless to maintain a

20      sidewalk in such a condition during those five

21      years before Jane Walters fell?

22          MR. PHELPS:   Object to form, foundation.

23  A   To maintain the sidewalk?

24  Q   To keep it in that condition.

25          MR. PHELPS:   Same objection.

1   A    **I -- yeah.**

2   Q    **By keeping the sidewalk in that condition for**

3         **those five years or leaving it in that condition**

4         **for five years, Dollar General was putting people**

5         **at risk of injury or death, true?**

6                 **MR. PHELPS:  Object to form,**

7         **argumentative.**

8   A    **Yes.**

9   Q    During those five years before Jane Walters was

10        injured, was Dollar General open seven days a

11        week?

12   A    **Yes.**

13   Q    Closed on major holidays?

14   A    **Yes.**

15   Q    Like Fourth of July, Christmas -- or you tell me

16        when it was closed.  Sorry.

17   A    **Thanks -- well, no, Christmas and Thanksgiving at**

18        **that time.**

19   Q    So just a couple of days a year that it was

20        closed.

21   A    **Well, I think at the beginning we was closed -- we**

22        **had more holidays closed.  Now it's just one**

23        **holiday closed.**

24   Q    And the store would generally be open what hours

25        during that period of time?